UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KAREN GENDRON,                              :
      Plaintiff,                    :
                                :
      v.                            :     C.A. No. 14-460M
                                :
CAROLYN W. COLVIN, ACTING                  :
COMMISSIONER OF SOCIAL SECURITY,           :
      Defendant.                    :

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

      Plaintiff Karen Gendron's fourth application for disability insurance benefits ("DIB")

under 42 U.S.C. § 405(g), Tr. 134-35, based on gastroesophageal reflux disease ("GERD"),

chronic gastritis, colitis, irritable bowel disease ("IBD"), attention deficit hyperactivity disorder,

carpal tunnel syndrome and chronic mononucleosis, poses an unusual challenge for an

adjudicator.  Tr. 33.  She applied only for DIB[1] on January 6, 2012, claiming onset of disability

beginning on June 1, 2007.  Because she last met the "insured status" prerequisite to DIB[2] on

June 30, 2007, the focus of her claim of disability necessarily is on the month of June 2007.  Put

differently, to qualify for benefits, she must establish that she became disabled prior to June 30,

2007, and was disabled during the month of June 2007, which is almost five years prior to the

---

[1] Her application confirms: "I do not want to file for SSI."  Tr. 120.

[2] See 42 U.S.C. § 423(a)(1)(E); McDonough v. Colvin, No. CA 14-036 ML, 2014 WL 7012451, at *7 (D.R.I. Dec. 11, 2014) (in DIB case, issue is whether plaintiff was disabled at any time from alleged onset date through date last insured); see also Mason v. Comm'r of Soc. Sec., 430 F. App'x 830, 831 (11th Cir. 2011).  Because Plaintiff's alleged onset date and date last insured both occurred several years before she filed her application for DIB, the agency was required to develop her medical history for the twelve-month period prior to the month she was last insured for DIB, that is, beginning on June 30, 2006.  20 C.F.R. § 404.1512(d)(2).  Because a disabling impairment must persist for at least twelve months following onset, 42 U.S.C. § 416(i), the twelve month period following the alleged date of onset is also relevant.  In this report and recommendation, that period – from June 30, 2006, to June 30, 2008 – will be referred to as the "Relevant Period."

date of her application.  <u>Torres v. Sec'y of Health & Human Servs.</u>, 845 F.2d 1136, 1138 (1st

Cir. 1988).

Plaintiff has presented this Court with three reasons for seeking reversal of the decision

of the Commissioner of Social Security (the "Commissioner") denying her application.  First,

she claims that the Administrative Law Judge ("ALJ") erred in basing his Residual Functional

Capacity ("RFC")[3] finding on the opinion of a non-examining state agency physician who lacked

access to the entire record and in failing to obtain a current medical source opinion properly

based on review of the record as a whole.  Second, she argues that the ALJ erred in accepting an

unsupported reviewing physician opinion when his own review of the medical record resulted in

the conclusion that Plaintiff was more limited.  Third, she asserts that the ALJ's adverse

credibility determination lacks substantial evidentiary support.  Defendant Carolyn W. Colvin

("Defendant") has filed a motion for an order affirming the Commissioner's decision.

This matter has been referred to me for preliminary review, findings and recommended

disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entire record, I find no

legal error and that the ALJ's findings are well supported by substantial evidence.  Accordingly,

I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the

Commissioner of Social Security (ECF No. 12) be DENIED and Defendant's Motion for an

Order Affirming the Decision of the Commissioner (ECF No. 13) be GRANTED.

## I.    **Background Facts**

### A.    **Plaintiff's Background**

Born in 1970 with some college education, Plaintiff lives with her two children and her

boyfriend.  Tr. 35-36.  Until she was thirty-two years old, she worked in a group home for

---

[3] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

behavior disordered adolescent girls, as a bank teller and as a customer service representative. Tr. 48, 156-57.  She stopped working in July 2002 because of the medically complicated birth of her daughter.  Tr. 36, 462.  Later in 2002, she had gall bladder surgery and a tubal ligation due to an ectopic pregnancy.  Tr. 664, 683, 699.  In her function report prepared in March 2012, Plaintiff stated that severe abdominal pain, fatigue and constant fever limit her from more than brief sitting, standing, walking or pursuit of her former interests or activities.  Tr. 148, 152. Despite these symptoms, she is able to care for her daughter, including taking her to school and helping her with homework, to cook meals (with attention to allergy-free recipes), to fold laundry, to iron clothes and to go out every day.  Tr. 149-55.  Since 2010, she has been using glasses when she reads, writes and uses the computer.  Tr. 154.  The only information in the function report potentially related to the Relevant Period[4] is her claim that, when her daughter was younger, she used to be able to play indoor/outdoor games with her, but by 2012 was unable to do so.  Tr. 149.  As least one provider recorded that she considers herself to be a "homemaker."  Tr. 613; see Tr. 393.

The focus of Plaintiff's appeal is on her physical impairments.  In her application, Plaintiff included attention deficit hyperactivity disorder ("ADHD") as a disabling mental impairment.  Tr. 33.  However, it was diagnosed for the first time long after the Relevant Period in 2010 or 2011 and, since, has been successfully treated with medication.  Tr. 238, 413.  Two reviewing psychologists found that no mental impairments were established during the Relevant Period or at any time prior to Plaintiff's last insured date.  Tr. 61, 70.  Based on these opinions, the ALJ incorporated no mental impairments into his RFC.  Plaintiff does not challenge this finding.  Her mental health will not be discussed further in this report and recommendation.

---

[4] The Relevant Period is defined in note 2, *supra*.

**B.**     **Medical Treatment from 2003 through 2011**

During 2003, long prior to the Relevant Period, Plaintiff treated primarily with Dr. Fred Ferri, her longstanding primary care physician, for abdominal discomfort.  See Tr. 628 ("feeling well . . . a little abdominal discomfort"), Tr. 625 (colonoscopy found small polyp, no bowel disease; "feeling well").  In May 2003, she went to the emergency room complaining of abdominal pain, but left hours later against medical advice; the record does not reflect any follow-up.  Tr. 468-69, 478.   In March 2004, Plaintiff was referred for evaluation of carpal tunnel syndrome to neurologist Dr. William Golini by hand specialist Dr. Leonard Hubbard; despite some positive clinical findings, testing was all normal and no follow-up treatment was recommended.  Tr. 613-16.  Throughout the Relevant Period, there is no reference to carpal tunnel or any limits affecting Plaintiff's use of her hands.  Also in 2004, she was referred to a rheumatologist, Dr. Scott Toder, for arthralgias and myalgias.  Tr. 442, 622-24.  Although an initial Lyme disease test was positive, the secondary test was not, and none of Dr. Toder's other testing (MRIs and bone scans) turned up any abnormality.  Tr. 442-51.  Ultimately, Dr. Toder mentioned, but did not diagnose, fibromyalgia, Tr. 452; the record reflects no follow-up regarding these symptoms until long after the end of the Relevant Period.  Tr. 313-14.

The balance of Plaintiff's treatment to the end of 2005 was with Dr. Ferri; in December 2004, he sent her for an MRI of her shoulder, which showed no tear and improved without treatment.  Tr. 620.  He also noted "chronic abdominal pains."  Tr. 621.  In September 2005, he sent her for testing to rule out celiac disease, but the record is silent regarding whether she got the test or what it showed.  Tr. 618.  There is no record reflecting a diagnosis of celiac disease.  Plaintiff did not see Dr. Ferri or get any other treatment for a year.  In January 2006, six months before the start of the Relevant Period, Plaintiff began treating with Dr. Christy Dibble, a

gastroenterologist at Women & Infants Hospital, who diagnosed gastritis, colitis and early inflammatory bowel disease ("IBD"); she prescribed Asacol to treat colitis and IBD and Protonix for gastritis.  Tr. 217, 219, 375.

At the beginning of the Relevant Period, in June 2006, Dr. Dibble diagnosed refractory[5] GERD and recommended surgery, a laparoscopic fundoplication, Tr. 200, which was done in September 2006.  Tr. 518.  Within a month, Dr. Dibble's notes reflect that Plaintiff had "done extremely well," that the surgery had produced "excellent results," and that she should continue conservative management.  Tr. 198.

No additional treatment occurred until April 2007, just two months before the alleged onset date, when Plaintiff saw Nurse Nancy Botelho, a nurse practitioner in the Women & Infants gastroenterology clinic.  She told Nurse Botelho that she was waking up at night with "increased heartburn and reflux and discomfort" and was having occasional diarrhea, for which she continued to take Asacol.  Tr. 369.  To treat the heartburn, Zantac was prescribed; by her next appointment on April 30, 2007, Plaintiff told Nurse Botelho that GERD was "doing much better."  Tr. 379.  Because she was still moving her bowels three times a day, Nurse Botelho increased the prescription for Asacol and suggested that other medication might be considered if there was no improvement.  Tr. 379.  No follow-up appears in the record.  The tweaking of Plaintiff's medications appears to have been successful – the lack of further abdominal pain or continued diarrhea is confirmed by the next treating record.  At Plaintiff's annual physical with Dr. Ferri on September 18, 2007, less than three months after the date last insured, Plaintiff's only complaint was that she was worried about B12 deficiency because of her diet limitations due to allergies.  Tr. 271.  On physical examination, Dr. Ferri found no issues; he specifically

---

[5] Refractory means resistant to treatment.  See Sanders v. Colvin, No. 5:13-CV-790-D, 2015 WL 736088, at *13 (E.D.N.C. Feb. 20, 2015) (citing Stedman's Medical Dictionary (2014)).

recorded that she had been experiencing "no heartburn, no vomiting, no abdominal pain, no diarrhea, no constipation and no blood in stool" and "no loss of appetite, no fever, no weight loss, no fatigue." Tr. 271. He observed that Plaintiff appeared "normal, well nourished and hydrated, alert, comfortable, smiling appropriately" and continued the prescriptions for Asacol and Zantac. Tr. 272-73. Plaintiff's only medical treatment during the critical month of June 2007 was on June 22, when Dr. Frank Savoretti, who was covering for Dr. Ferri, diagnosed a cold. Tr. 274. There is no further reference to abdominal pain or diarrhea until well after the end of the Relevant Period.

During the post-insured portion of the Relevant Period, in October 2007, Dr. Ferri diagnosed mononucleosis, for which he prescribed rest and no strenuous exercise; no abdominal issues are mentioned besides the continuing need to take medication. Tr. 267-68. The treatment history next jumps to 2008, during which Plaintiff saw Dr. Ferri for sinus pressure in January and a fever in April (which he concluded was probably viral). Tr. 263-66. Soon after the end of the Relevant Period, Dr. Ferri conducted the annual physical in September 2008 and sent her to physical therapy for her shoulder. Tr. 262. At the same appointment, Dr. Ferri noted that GERD remained "[s]table and asympotomatic," with no abdominal pain and no diarrhea. Tr. 259-62. Other than an annual physical and an ear infection, there is no treatment of note in 2009 or 2010, including no abdominal pain and no diarrhea, except for follow-up for cysts found during a routine breast examination resulting in the finding of no malignancy. Tr. 248-58, 281. In 2011, Plaintiff again tested positive for mononucleosis in September, Tr. 242, but by October 2011, Dr. Ferri wrote that GERD was still asymptomatic, IBD was still clinically stable and she was "[f]eeling well, offers no complaints," including no abdominal pain and no diarrhea. Tr. 238.

### C.        Medical Treatment after DIB Application Filed in January 2012

Four years after the end of the Relevant Period, on January 6, 2012, Plaintiff filed her DIB application claiming disability based on ADHD, chronic gastritis, inflammatory bowel disease, colitis, gastric reflux and chronic mononucleosis.  Tr. 19, 33, 139.  At about the same time, her medical issues appear to have intensified, both with respect to the amount of treatment sought and provided (including the amount of diagnostic testing performed) and with respect to the seriousness of Plaintiff's complaints.  The result is a substantial medical record reflecting complaints of abdominal pain so severe that she could not move, but lay curled in a ball, Tr. 352, 357, resulting in at least one trip to the emergency room, Tr. 527, bowel movements five to six times per day, Tr. 397, joint pain that brought her back to Dr. Toder, the rheumatologist, Tr. 313, hand pain that sent her back to Dr. Hubbard, the hand specialist, and Dr. Golini, the neurologist, Tr. 391-96, and diagnostic exploration of possible heart and gynecological issues.  E.g., Tr. 408-12, 420-22.

Somewhat inconsistently, Dr. Ferri's note from Plaintiff's annual physical in October 2012 states that GERD is asymptomatic and inflammatory bowel disease "remains clinically stable."  Tr. 413.  Regarding her new complaint of joint and muscle aches, Plaintiff returned to Dr. Toder; his examination and extensive testing resulted in all normal findings except for his observation of a sore throat and a temperature of 99.4 degrees.  Tr. 313.  In 2013, she went to Dr. Hope Dillon, a different rheumatologist, whose notes are illegible, but who sent Plaintiff for an abdominal ultrasound and a spinal xray.  Tr. 434-41.  Both were normal.  Regarding her complaint of carpal tunnel syndrome, Plaintiff saw Dr. Hubbard in September 2012, and told him that she now wanted surgery.  Tr. 391-92.  He diagnosed carpal tunnel syndrome, noting that the thumb pain "is somewhat more recent," and referred her to the same neurologist, Dr. Golini, who

found "mild, right-sided carpal tunnel syndrome and borderline, left-sided carpal tunnel syndrome." Tr. 392-94. Although the record is developed through the end of March 2013, it does not reflect that the carpal tunnel surgery was ever scheduled or performed. Also during 2012, Plaintiff tested positive for mononucleosis, which had first been diagnosed in October 2007, Tr. 226-27, Tr. 267-68, and had diagnostic procedures to explore whether the dramatically worsened abdominal pain might be linked to uterine fibroids or an ovarian cyst. Tr. 420, 545, 549.

### D.   Relevant Opinion Evidence

On May 9, 2012, state agency consultant Dr. Kenneth Nanian opined that, as of June 30, 2007, her date last insured, gastritis and duodenitis were severe impairments and IBD was not severe. Tr. 61. He opined that Plaintiff could occasionally lift and carry up to fifty pounds, frequently lift up to twenty-five pounds and sit, stand or walk each for six hours in an eight-hour workday, but that she would need to have access to a toilet during the workday. Tr. 62. On July 25, 2012, state agency consultant Dr. Donn Quinn concurred in these opinions. Tr. 69-71.

Plaintiff did not present any opinion evidence in support of her claim that she was disabled prior to (or after) June 30, 2007. No source has opined that Plaintiff was afflicted by disabling limitations at any time during the Relevant Period.

## II.   <u>Travel of the Case</u>

On January 6, 2012, Plaintiff applied for DIB, Tr. 65, alleging disability beginning June 1, 2007. Tr. 58. Plaintiff's application was denied initially and on reconsideration. Tr. 65, 74. At Plaintiff's request, the ALJ held a hearing on May 7, 2013, at which Plaintiff, represented by an attorney, and an impartial vocational expert ("VE") testified. Tr. 31-32. On June 14, 2013, the ALJ issued his decision finding that Plaintiff was not disabled from her alleged onset date through June 30, 2007, her date last insured. Tr. 16-26. On August 18, 2014, the Appeals Council denied

Plaintiff's request for review, Tr. 1-3, making the ALJ's decision the Commissioner's final decision subject to judicial review.  42 U.S.C. § 405(g).

## III.   The ALJ's Hearing and Decision

At the hearing on May 7, 2013, Plaintiff testified that she drives regularly and takes her daughter to school, but cannot sit or stand for more than twenty minutes.  Focusing on the period five years prior, during the month of June 2007, she swore that she dropped things from both hands and had problems opening jars and cutting food, could not use anything with push or pull leg controls, had significant problems with stooping, squatting, kneeling, bending, climbing stairs, concentrating and performing complex tasks, and could never cook, do laundry, clean, shop more than once a week with help, use a computer, go to church, or pursue any hobbies; in short, during the Relevant Period, she claimed she could not perform virtually any of the functions about which the ALJ questioned her.  Tr. 40-41, 43-44.  On an average day in June 2007, she claimed that she used the bathroom up to six times for fifteen minutes each.  Tr. 44.

For the vocational evidence, the ALJ asked the VE to respond to a hypothetical based on the opinions of Drs. Nanian and Quinn, assuming an individual who could lift fifty pounds occasionally and twenty-five pounds frequently, sit, stand or walk six hours in an eight-hour workday, and needed to use the toilet once in the morning and once in the afternoon outside normal breaks.  Tr. 51-52.  The VE testified that such an individual could perform Plaintiff's past relevant work as a bank teller and customer services phone representative, as well as other light and sedentary unskilled jobs in assembly, inspection, production labor and machine tending.  Tr. 52-53.  If the bathroom use were increased by adding thirty minutes in the morning and again in the afternoon, outside of normal breaks, the VE opined that prior work would not be available

and that the other jobs identified for the first hypothetical would be cut in half.[6]  Only if the

individual would also be absent once a month would all work be precluded.  Tr. 56.

Focusing on Plaintiff's medical records from 2002 to 2012, but with particular attention

to the period preceding the date last insured, the ALJ issued a decision finding that Plaintiff was

not disabled within the meaning of the Act from her alleged onset date on June 1, 2007, through

June 30, 2007, her date last insured for DIB.  Tr. 16-26.

## IV.   <u>Issues Presented</u>

Plaintiff presents three arguments in support of her claim that the Commissioner's

decision is not supported by substantial evidence and is infected by legal error:

1.   For his RFC finding, the ALJ improperly relied on the opinion of a non-
     examining physician prepared before most of the record was assembled; relatedly,
     the ALJ erred in failing to develop the record by obtaining an opinion from a
     medical source who reviewed the entire record.

2.   The ALJ wrongly based his denial of Plaintiff's claim on a reviewing physician
     opinion that she was capable of working at the medium exertional level, which is
     both unsupported by the medical record and contrary to the ALJ's own findings
     regarding the limitations established by the medical record.

3.   The ALJ erred in making an adverse credibility determination at odds with the
     reviewing physicians' conclusion that her statements about the intensity,
     persistence and functionally limiting effects of her symptoms were substantiated
     by the objective medical evidence.

## V.   <u>Standard of Review</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Ortiz v.</u>

---

[6] Plaintiff makes an undeveloped argument that this aspect of the VE's testimony was so confusing as to require
reversal.  Seeing no confusion at all, I will not address the argument further.  <u>Vineberg v. Bissonnette</u>, 529 F. Supp.
2d 300, 305 (D.R.I. 2007) (when party fails to adequately develop an argument, court is free to disregard it).

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v.

Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819

F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991);

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole.

Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d

192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also

must consider evidence detracting from evidence on which Commissioner relied).  Thus, the

Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30.

The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of

the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148,

153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not

the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies

incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that

the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam);

accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001). On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that

there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).  With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact. Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand.  Id.

## VI.   **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.   **Developing the Record**

Social Security proceedings are "inquisitorial rather than adversarial."  Sims v. Apfel, 530 U.S. 103, 110-11 (2000); Miranda v. Sec'y of Health, Educ. & Welfare, 514 F.2d 996, 998 (1st Cir. 1975) (social security proceedings "are not strictly adversarial.").  The ALJ and the Appeals Council each have the duty to investigate the facts and develop the arguments both for and against granting benefits.  Sims, 530 U.S. at 110-11.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  Evangelista, 826 F.2d at 142.  Courts in this Circuit have made few bones about the responsibility that the Commissioner bears for adequate development

13

of the record.  Id.; see Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 80-81 (1st Cir.

1982); Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

**B.      The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §

404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not

disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or

combination of impairments that significantly limit physical or mental ability to do basic work

activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. §

404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's

impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. §

404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past

work) prevent doing other work that exists in the local or national economy, a finding of disabled

is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at

Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart,

267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments and must

consider any medically severe combination of impairments throughout the disability

determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and

well-articulated findings as to the effect of a combination of impairments when determining

whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  42 U.S.C. § 416(i)(3); Deblois, 686 F.2d at 79.  If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied.  Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### C.      Making Credibility Determinations

When an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence.  See Frustaglia, 829 F.2d at 195.  The lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence so that the credibility determination is determinative, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

### VII.      Application and Analysis

### A.      State Agency Physician Opinion and Developing the Record

Plaintiff's primary appeal argument focuses on the ALJ's decision to afford "significant weight" to the opinion of state agency reviewing physician, Dr. Donn Quinn,[7] rendered on July 25, 2012, because, between that date, and the hearing on May 7, 2013, more than three hundred

---

[7] Plaintiff's critique focuses on the opinion of Dr. Quinn, which was prepared after the record was more fully developed on reconsideration.  Tr. 70-71.  Dr. Quinn's opinion is the same as that of Dr. Nanian, who opined in connection with the initial review.  Tr. 62-63.  While there is no material difference between them, this report and recommendation will follow Plaintiff's lead and refer primarily to Dr. Quinn.

pages of additional material were added to the record.[8]  Instead of using Dr. Quinn as the foundation for the RFC, Plaintiff contends that the ALJ should have discharged his duty fully to develop the record by obtaining a more current medical opinion from a source who had reviewed the entire record.  By failing to do so, Plaintiff argues, the ALJ has breached the settled proposition that bars him from making untutored medical judgments.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996); Nguyen, 172 F.3d at 35.

With Plaintiff's last insured date and the Relevant Period between four to six years before the date as of which the record was finally fully assembled, the viability of this argument depends on the extent to which the records relevant to a disabling impairment commencing prior to June 30, 2007, were assembled for submission to Dr. Quinn for review.[9]  That question cannot be answered without an examination of which medical records were received, and which were not received, in time for review by Dr. Quinn.  This is a matter not as easy to resolve as one might expect.

For starters, it appears clear that the record reviewed by the state agency physicians included the first eight exhibits.  Tr. 190-315.  Consistently, the generic lists of records received prior to the initial review and prior to reconsideration, Tr. 59-60, 67-69, 75, 81, include virtually

---

[8] Plaintiff makes a related argument – that the ALJ was improperly constricted to the period between June 1 and June 30, 2007 – that does not require an extended exegesis.  The premise is simply wrong.  The ALJ carefully considered all of the medical evidence in the record beginning with Plaintiff's gynecological problems at the birth of her daughter in 2002 through 2012.  Tr. 22.  The ALJ clearly focused not just on the precise period in issue (June 2007) but also on the surrounding period between 2006 through 2010, with particular emphasis on limitations established on or before June 30, 2007.  Tr. 22-23, 25.  His examination of the medical records is entirely consistent with his obligation to develop and consider Plaintiff's medical history for the twelve-month period beginning in the month of onset of disability, as well as for the twelve-month period prior to the date last insured.  20 C.F.R. § 404.1512(d)(2).  It is only the ALJ's examination of Plaintiff at the hearing and his final holding – that Plaintiff was not disabled during the month of June 2007 – that correctly narrow the lens to the period in issue.  See Giusti v. Astrue, No. 11-360, 2012 WL 4034512, at *9 (D.R.I. Aug. 22, 2012); McDonough, 2014 WL 7012451, at *7.

[9] Plaintiff also argues that this Court should assume that Dr. Quinn did not review a record that was part of the file available to him unless he named it in his assessment.  That argument does not hold water.  The reviewing medical expert is not required to name every record reviewed.  Winchester v. Astrue, No. 5:10-CV-262-OC-18TBS, 2012 WL 275481, at *5 (M.D. Fla. Jan. 5, 2012).

every provider for the Relevant Period.  Also consistent is the explanation incorporated by Dr.

Quinn into his opinion – it makes clear that he reviewed records reflecting diagnostic evaluation

of, and symptoms pertaining to, serious GERD requiring surgery, colitis, gastritis, diarrhea,

consideration of celiac disease and mononucleosis.  Tr. 67-71.  Obviously omitted from Dr.

Quinn's review are all the records that did not exist until after July 25, 2012, when he signed his

opinion; this includes Exhibits 13F-20F and 27F, Tr. 391-441, 725-26, as well as parts of

Exhibits 11F, 22F-23F and 26F.  For the balance of the records, apparently the only way to

confirm that a particular page of a record was received before Dr. Quinn's file review is to

reference the fax line at the very top of the page, which establishes the date on which the page

was faxed to the Social Security Administration.  And this tedious task is occasionally foiled

because some pages, though obviously faxed to the Social Security Administration and made

part of the record at some point, have no fax line, presumably because the top of the page was

cut off when it was copied.[10]  Once the records are sorted into those to which Dr. Quinn did have

access, those to which he did not have access and those to which it is impossible to tell, the

inquiry shifts to the set to which Dr. Quinn either did not, or might not, have had access.  As to

these, the Court must determine whether they are potentially relevant to Plaintiff's claim of

disability, so that Dr. Quinn's failure to consider them renders the ALJ's reliance on his opinion

reversible error.  See Padilla v. Barnhart, 186 F. App'x 19, 22-23 (1st Cir. 2006) (per curiam)

(opinions of consulting physicians who had incomplete medical record should not be given

controlling weight); Hall v. Colvin, 18 F. Supp. 3d 144, 154 (D.R.I. 2014).

The first two categories not available to the reviewing physicians are records relating to

the 2004 medical complaints that disappear during the Relevant Period only to surface again in

---

[10] The confusion is heightened by the production of records by certain providers during the period of initial review, followed by a second production for a more expanded period by the same provider, often at Plaintiff's request after the state agency physicians' opinions had been prepared.  The result is that certain records were produced twice.

2012 and 2013. The fax line confirms that Dr. Quinn did not see the 2004 records evaluating carpal tunnel syndrome, resulting in the recommendation that no treatment was needed but suggesting further testing if the pain persisted or worsened. Tr. 613-16. Nor did Dr. Quinn see the next reference to the possibility of treatment for carpal tunnel syndrome in August 2012, when Dr. Golini diagnosed mild right-side and borderline left-side carpal tunnel. Tr. 391-94. The complete record confirms that Plaintiff did not seek any treatment for, or complain of, pain or any difficulty with her hands at any time during the Relevant Period. These records (both those from 2004 and those from 2012) are plainly irrelevant to whether Plaintiff developed disabling limitations prior to June 30, 2007, that affected her during the Relevant Period.

Similarly, the 2004 records for Dr. Toder, the rheumatologist, were not procured until after Dr. Quinn's review; they reflect testing based on Plaintiff's complaints of arthralgias and myalgias, none of which resulted in any abnormal findings or follow-up. Tr. 442-53. While Dr. Toder noted that fibromyalgia was possible, Tr. 443, it was never diagnosed and he made no recommendation for treatment. Tr. 443. By the end of 2004 through the end of the Relevant Period, no further treatment was sought from any rheumatologist and Dr. Ferri's notes no longer reflect any complaint of arthralgias and myalgias. Tr. 621. The complete record confirms that such a complaint did not come up again until 2012, shortly after Plaintiff filed her DIB application, when Dr. Ferri sent her back to Dr. Toder, who again found nothing[11] and recommended that she see an infectious disease specialist. Tr. 313-14. In 2013, Plaintiff saw another rheumatologist, who sent her for testing all of which was normal. Tr. 440-41. Like the 2004 rheumatology records, neither 2012 nor the 2013 rheumatology records were in the file seen by Dr. Quinn. With not even a suggestion during the Relevant Period that Plaintiff

---

[11] See Tr. 352 ("She was seen by Rheumatologist and all her testing was normal.").

18

complained of the symptoms addressed by rheumatologists in 2004 and 2012/2013, it is plain

that they are not relevant and there is no need for a medical expert analysis of any of these

records.

Next, Plaintiff points to Dr. Ferri as a critical treating source whose notes did not all

make it into the record reviewed by Dr. Quinn.  However, Dr. Ferri's notes and files for the

Relevant Period, indeed, all records for the period from 2006 until January 2012, were available

for review by Dr. Quinn.  The unavailable portions of Dr. Ferri's notes pertain to the more

remote past and present periods – specifically forty-three pages of records from 1994 through

September 15, 2006 (Tr. 618-61)[12] and twenty-five pages from October 2012 through March

2013 (Tr. 406-17, 421-33).  From the early period, the only potentially relevant entry comes

from the year preceding the Relevant Period, when Dr. Ferri saw Plaintiff for a "comprehensive

exam" in September 2005; based on her statement that she was concerned about celiac disease,

he ordered tests.  Tr. 618.  However, there is no evidence suggesting that celiac disease was ever

diagnosed, which Dr. Quinn expressly considered.  Tr. 71 ("no objective evidencesof [sic] . . .

celiac disease").  The balance of the Ferri records not available to Dr. Quinn are from late 2012

and 2013.  Tr. 406-17, 421-33.  They reflect mammogram follow-up (no malignancy found),

ultrasounds (findings include ovarian cyst expected to resolve in four to six weeks and stable

fibroid uterus), and an echocardiography report (cardiologist recommends Holter monitor, but

expresses expectation that "no further workup needs to be done at this time").  Tr. 406, 408, 412.

These new records largely reflect diagnostic procedures in 2013 arising from Plaintiff's

complaints – beginning in 2012 – of serious abdominal pain.  Tr. 421-33.  None of these

potentially serious issues are pertinent to Plaintiff's limitations during the Relevant Period, when

---

[12] The Exhibit comprising this set of records includes Dr. Ferri's notes from September 2006; however, the same notes were also produced in 2012 and were part of the record presented to Dr. Quinn.  Tr. 275-76, 617.

she consistently reported no abdominal pain and no diarrhea once GERD was addressed surgically and Zantac and Asacol were correctly prescribed.

Finally, Plaintiff contends that Dr. Quinn was not given, and therefore did not consider, the April 2007 notes of Nurse Botelho, who treated Plaintiff at the Women & Infants Hospital gastroenterology clinic.  Plaintiff contends that Dr. Quinn's failure to consider these notes renders the ALJ's reliance on his opinion reversible error.

The background may be briefly reprised.  In April 2007, Nurse Botelho had two appointments with Plaintiff – they are squarely in the Relevant Period and just two months before her period of alleged disability.  Tr. 367-70, 379-80.  At the first, on April 16, 2007, Plaintiff told Nurse Botelho that she had increased heartburn and occasional diarrhea; the notes from this appointment have no fax line and the Commissioner concedes that it is not possible to confirm whether these notes were available to Dr. Quinn.  Tr. 369.  Two weeks later, on April 30, 2007, Plaintiff returned to Nurse Botelho.  In these notes, Nurse Botelho refers to the issues raised at the prior appointment and confirms that the prescription for Zantac, written at the April 16 appointment, was working well – "she is doing much better with her reflux since she has been placed on her Zantac."  Tr. 367, 379.  To address the occasional diarrhea mentioned at the April 16 appointment and bowel movement irregularity referenced on April 30, Nurse Botelho increased Plaintiff's Asacol prescription, noting that a further medication change might be prescribed if her bowel movements did not improve.  Tr. 367, 379.  No additional medication was prescribed.  Plaintiff did not return for another appointment with Nurse Botelho for over a year and a half.  Tr. 363.  And at her September 2007 annual physical with Dr. Ferri, she reported that she was experiencing no abdominal pain and no diarrhea.  Tr. 271-73.

While Plaintiff may be right about the April 16, 2007 notes,[13] this Court's review of the April 30, 2007 note in the context of the entire record resulted in the discovery that it had been produced twice. Although the version Plaintiff cites (Tr. 367-68) has no fax line, permitting the argument that it was not available to Dr. Quinn, an identical copy of the same notes (Tr. 379-80), was produced with a fax line showing that it was produced in plenty of time to be incorporated into the record presented to Dr. Quinn for review. That Dr. Quinn did review and did consider Nurse Botelho's April 30, 2007 note is confirmed by his express references to "indeterminant colitis txed w/ Asacol 400mg BID,"[14] "freq. diarrhea w/ some med. improvement," and "poorly controlled gastritis better w/ Nissen fundoplication on Zantac." Tr. 71. Accordingly, the potential omission of the April 16, 2007 note from the file review is insufficient to undermine the integrity of Dr. Quinn's opinion, in light of his review and express consideration of the note from the follow-up appointment that addressed all of the same symptoms.

To summarize, Plaintiff is right that almost 340 pages of records were procured and produced after the file review by the state agency physicians. Tr. 390-726. However, the Commissioner is right that these records are not material to a disability analysis that must focus on June 2007 and on the twelve-month period preceding and following June 30, 2007. As the ALJ found, neither the pre-2005 records nor the 2012-2013 records reflect treatment for conditions that persisted during the Relevant Period. The lack of the only arguable exception – Nurse Botelho's April 16, 2007 note – does not justify remand because it reflects symptoms also addressed and resolved in Nurse Botelho's follow-up note from April 30, 2007. In short, there are no records relevant to Plaintiff's claim of disability that were not available to Dr. Quinn.

---

[13] To be clear, it is entirely possible that Dr. Quinn did see and consider the April 16, 2007 note. Because its fax line was cut off, it is impossible to be certain.

[14] This is the precise dosage prescribed in Nurse Botelho's April 30, 2007 note. Tr. 379.

Pelletier v. Colvin, No. 13-651, 2015 WL 247711, at *14 (D.R.I. Jan. 20, 2015) ("The expert

opinion of a non-examining source . . . may amount to substantial evidence where it represents a

reasonable reading of the entirety of the *relevant* medical evidence.") (emphasis added).

Based on the foregoing, I find no error in the ALJ's reliance on Dr. Quinn's opinion in

making his RFC finding.  See, e.g., Konuch v. Astrue, No. 11-193 L, 2012 WL 5032667, at *8

(D.R.I. Sept. 13, 2012) ("The issue is whether Plaintiff was under a disability as of that date, and

the Court is unpersuaded that [a] report . . . created almost one year beyond the relevant time

period[ ] undermines the ALJ's finding that Plaintiff was not."); Marczyk v. Astrue, No. CA 08-

330A, 2009 WL 2431464, at *14 (D.R.I. Aug. 7, 2009) (where consulting opinions rendered in

2005, which is the period in issue in light of date last insured, argument that they are stale has no

merit with respect to DIB claim); Bertsch v. Astrue, No. 07-421 ML, 2009 WL 1648907, at *6, 8

n.13 (D.R.I. June 10, 2009) (no error in reliance on state agency opinion based on review of

record lacking medical complaints voiced long after insured status expired, because no evidence

that such complaints arose in period prior to the expiration of insured status).  Further, in light of

the reviewing physicians' "reasonable reading of the entirety of the relevant medical evidence,"

there was also no need for the ALJ to replow this ground by obtaining updated opinion evidence

from a medical expert.  See Pelletier, 2015 WL 247711, at *14-15.

### B.    ALJ's RFC Determination

Plaintiff's next argument for reversal focuses on what she claims is an ambiguous phrase

in the ALJ's decision: "the Administrative Law Judge has great difficulty accepting the limit to

medium work."  Tr. 25.  She interprets this phrase as a reflection of the ALJ's real view that

Plaintiff was actually far more limited than is reflected in the state agency opinions.  In support

of this interpretation, she points to two specific findings in Dr. Quinn's opinion that she contends justify the ALJ's skepticism.  My analysis begins with them.

First, Plaintiff points to what she contends is the palpably unsupportable assumption in Dr. Quinn's opinion that she can lift or carry fifty pounds "occasionally," and twenty-five pounds "frequently."  Tr. 71.  Citing <u>Forbes v. Colvin</u>, No. 14-249, 2015 WL 1571153, at *9 (D.R.I. Apr. 8, 2015), Plaintiff posits that this aspect of Dr. Quinn's opinion "is so outrageous" that it gave the ALJ pause.  ECF No. 12-1 at 14.  Accordingly, Plaintiff concludes that the ALJ committed reversible error by relying on Dr. Quinn as the foundation for the RFC finding.

This argument does not hold water.  The record has ample support for Dr. Quinn's conclusion that Plaintiff could occasionally lift fifty pounds.  For starters, her last job before she stopped work after the birth of her daughter was at a group home for behavior disordered adolescent girls; it involved lifting up to forty pounds and restraining the residents when necessary.  Tr. 156-57.  Second, the record establishes that, throughout the Relevant Period, Plaintiff was the full time caregiver to a child aged four, then five and then six years old, yet there is no suggestion that she was unable to care for or lift her daughter; to the contrary, in her function report, she wrote that she was able to play "Indoor/Outdoor games" with her daughter during periods prior to 2012.  Tr. 149.  Consistently, the record is devoid of any references suggesting that any provider opined that she had functional limitations affecting either her ability to lift or her ability to care for her daughter; Plaintiff certainly points to none.  <u>See</u> <u>Jones v. Astrue</u>, No. 09-206S, 2010 WL 2326261, at *10 n.1 (D.R.I. Feb. 19, 2010) (declining to remand where the plaintiff did not point to any objective evidence to contradict the RFC finding).  Plaintiff's contrary assertion that she could not lift more than five pounds, Tr. 37, 153, is subject to the ALJ's well-founded adverse credibility finding based on the dearth of medical evidence

establishing such an extreme limitation prior to June 30, 2007, continuing through 2010.  Tr. 25.
I find nothing outrageous or palpably unsupportable about this aspect of Dr. Quinn's opinion.

Second, Plaintiff contends that Dr. Quinn's reference to Plaintiff's "freq. diarrhea" and
"gastritis . . . occ. breakthroughs," Tr. 71, must be interpreted by importing the definitions of
"frequent" and "occasional" used to describe limitations in an RFC opinion.  Deploying these
definitions lead Plaintiff to conclude that Dr. Quinn must have found that, during the Relevant
Period, Plaintiff had diarrhea for two-thirds of the day and debilitating gastritis for one-third of
the day.  Pointing out that this frequency is even more severe[15] than her own testimony that she
used the bathroom five to six times a day for fifteen minutes each time, Plaintiff argues that it
justifies the ALJ's skepticism about Dr. Quinn's RFC opinion, rendering reliance on it reversible
error.  Tr. 71.

This tortured interpretation of Dr. Quinn's opinion is inconsistent with the medical
record.  During the Relevant Period, on which Dr. Quinn expressly focused, after GERD surgery
and the prescription of Zantac, gastritis became asymptomatic, and, after the prescription for
Asacol was increased, Plaintiff reported no more diarrhea or bowel irregularities.  Tr. 169, 198-
217, 259-71.  Prior to and during the Relevant Period, the references to the frequency of bowel
movements appear in Nurse Botelho's November 2005 notes, Tr. 377 (before Asacol prescribed,
two bowel movements a day, but episodes during which five or six times in one day); Nurse
Botelho's March 2006 notes, Tr. 373 (after Asacol prescribed, bowel movements two to four
times per day, but not diarrhea); and Nurse Botelho's April 2007 notes, Tr. 369-70 (Plaintiff
"does have occasional diarrhea where she will need to increase her Asacol"), Tr. 379 (Asacol
increased based on report of bowel movements three times a day).  No record from the Relevant
Period suggests daily diarrhea up to two-thirds of the day or even five to six times daily.

---

[15] The Court observes that such frequency of daily diarrhea over a protracted period could be life threatening.

Moreover, once Asacol was increased on April 30, 2007, the record reflects no further

difficulties – Plaintiff did not return to the gastroenterology clinic for a year and a half and, at her

next appointment with Dr. Ferri in September 2007, she told him that she was experiencing "no

abdominal pain" and "no diarrhea."  Tr. 271.

Finding nothing palpably outrageous about Dr. Quinn's opinion, I circle back to

Plaintiff's assertion that the ALJ's statement he had "great difficulty" accepting Dr. Quinn's

limitation to medium work, Tr. 25, means that the ALJ's own analysis compelled the conclusion

that Plaintiff was far more limited.  Read out of context, the phrase is certainly confusing in that

it is impossible to ascertain whether the "difficulty" is because the ALJ believed Plaintiff was far

more limited, as she argues, or because he believed she was less limited.  However, the meaning

becomes pellucid when the phrase is read in context with the remainder of the sentence in which

it is embedded and in context with the text that precedes it.  Thus, the preamble to the same

sentence expresses the ALJ's agreement with Dr. Quinn's conclusion that there was no evidence

of active colitis or celiac disease during the period in issue, compelling the latter interpretation,

that is, that the record does not support the conclusion that Plaintiff was as limited as Dr. Quinn

opined.  Consistently, the sentence opening the prior paragraph states that the ALJ's review of

the medical evidence caused him to conclude that there was "simply no evidence to show any

functional limitations during the period at issue."  Tr. 24.  Read in context, it is unambiguous that

the ALJ's skepticism arose from his conclusion that Dr. Quinn's finding that Plaintiff's RFC

permitted no more than medium work was more favorable to Plaintiff than the medical evidence

warranted.  This does not constitute error requiring remand.  See Morris v. Astrue, No. 11-625S,

2013 WL 1000326, at *16 (D.R.I. Feb. 1, 2013) (when ALJ assigns RFC more restrictive than

evidence warranted, potential error harmless), aff'd sub nom., Morris v. Colvin, 2013 WL 997132 (D.R.I. Mar. 13, 2013).

### C.    Credibility

Plaintiff does not strenuously challenge the ALJ's articulation of specific and adequate reasons supporting his finding that her testimony at the 2013 hearing about the severity of her symptoms and limitations in 2007 lacked credibility.  Rather, she argues only that the observations of the reviewing medical experts that her statements to treating medical providers about her symptoms were credible compels the finding that she must also be credible in claiming the extreme limitations made in support of her application and to which she testified at the hearing.  Tr. 62, 70.

To state the proposition is to expose its fallacy: Plaintiff can be credible in her interactions with treating providers during the Relevant Period and not credible in her testimony and statements made in connection with this DIB application.  Indeed, that inconsistency, buttressed by the "sparse and conservative" nature of the only treatment she got during the Relevant Period, is the precise foundation for the ALJ's well-supported finding that her "credibility . . . is weakened by inconsistencies between her allegations and the medical evidence."  Tr. 25.  This may readily be illustrated with several examples.  Plaintiff's statements to providers about abdominal issues after the successful GERD surgery in September 2006 were limited to two appointments in April 2007 where she first described the pain as "discomfort" and "occasional diarrhea," and then confirmed that "she is doing much better," with both complaints resolved with medication so that she reported no abdominal complaints, including no diarrhea, at her September 2007 appointment with Dr. Ferri.  Tr. 271-73, 369, 367.  This contrasts with her testimony that, during the same period, she was having diarrhea six times daily for an average of

fifteen minutes each time.  Tr. 44.  In a similar vein, Plaintiff's dramatic testimony about her near complete inability to use her hands as of June 30, 2007, Tr. 40-41, may be juxtaposed with the complete absence of such complaint to any provider during the Relevant Period.  Also potentially inconsistent is her testimony that she can never cook or do laundry, Tr. 43, which contrasts with her function report, which states that she cooks meals, folds laundry and irons clothes.  Tr. 149-55.

Recognizing as this Court must, that the ALJ's credibility finding is entitled to deference where, as here, it is supported by specific findings, Frustaglia, 829 F.2d at 195, I find that the ALJ's adverse credibility finding is well supported by substantial evidence.  See Cookson v. Colvin, No. 14-297, 2015 WL 4006172, at *10-11 (D.R.I. July 1, 2015).

## VIII.   Conclusion

Based on the foregoing analysis, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 12) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 13) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
October 29, 2015